**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 26-CR-32-RDM** |
| | : | |
| **LOUIS GERI,** | : | |
| | : | |
| **Defendant.** | : | |

# GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

On October 5, 2025, law enforcement arrested the defendant, Louis Geri, outside the Cathedral of St. Matthew the Apostle in Washington, D.C.,[1] where he had set up a tent containing over 100 homemade destructive devices. The defendant's target was the Red Mass, an annual religious service that marks the beginning of the Supreme Court term and asks the Holy Spirit to guide all those who are members of the legal profession. The event draws a large and distinguished crowd including Supreme Court justices, members of Congress, the President's Cabinet, diplomatic corps, local municipal, state and national government leaders, and sometimes, the President of the United States.[2]

The defendant traveled to St. Matthew's Red Mass all the way from Arkansas for a specific purpose: to use hand-made explosives to negotiate a list of demands with the federal government,

---

[1] St. Matthew's is the Mother Church of the Roman Catholic Archdiocese of Washington and the official seat (cathedra) of the Archbishop of Washington. The Church has great historical significance: The funeral Mass for President John F. Kennedy was celebrated in the Cathedral on November 25, 1963, with many international heads of state and governments in attendance. Mother Teresa visited the Cathedral in 1974. In 1979, Pope John Paul II celebrated Mass in the Cathedral during his visit to the United States. And Pope Francis presided at a Midday Prayer Service at the Cathedral with the U.S. Bishops during his visit to the United States in 2015. *See* About Us, Cathedral of St. Matthew the Apostle Washington, D.C. (Sept. 16, 2026), https://www.stmatthewscathedral.org/about.

[2] *Id.*

St. Matthew's Cathedral, the Supreme Court, and other groups and entities. The defendant's intent was clear: If his list of demands was not met, innocent people would die and prominent, historic landmarks, such as the Washington Monument, the Supreme Court, and the White House, would be destroyed.

The seriousness of the defendant's conduct is reflected not only in the statements he made to law enforcement, but also in the steps he took before his arrest. The defendant assembled more than 100 destructive devices, transported them into the District of Columbia, and staged them on the steps outside a prominent Catholic church that was about to hold a significant religious event. The defendant's actions created a substantial risk to the public, were designed to achieve political goals via violence, and required law enforcement intervention, which thankfully occurred before any explosives were detonated and any individuals were harmed.

Based on the defendant's dangerous criminal conduct, a substantial term of imprisonment is necessary to reflect the seriousness of the offenses, promote respect for the law, provide just punishment, protect the public from further crimes, and afford adequate deterrence. The United States respectfully requests a sentence of 87 months' imprisonment—the high end of the agreed upon Guidelines—and 3 years of supervised release.

## I. FACTUAL BACKGROUND

On the evening of October 4, 2025, at approximately 7:15 p.m., the defendant rode his motorcycle to St. Matthew's Cathedral, located at 1725 Rhode Island Ave NW Washington, D.C., and parked on the street directly in front of the church. The defendant unloaded a tent, multiple bags, and other personal belongings and placed them on the steps leading to the church's main entrance. He then assembled the tent on those steps, unpacked his belongings, and entered the tent, where he remained overnight.

On October 5, 2025, at approximately 5:00 a.m., members of the Metropolitan Police Department ("MPD") began sweeping the streets and sidewalks surrounding St. Matthew's Cathedral in preparation for the Red Mass, a high-profile public event, that was scheduled to occur at the location. At approximately 5:07 a.m., MPD officers approached the defendant and informed him that he would need to move his tent. The defendant refused and requested that MPD call federal agents to negotiate a nine-page list of handwritten demands.

The defendant then threatened to throw one of his explosive devices into the street to demonstrate its power. He stated that he possessed *more than one hundred explosive devices* and that *"several of your people are gonna die from one of these"* if he was unable to negotiate his demands (emphasis added). The defendant then provided his written demands to the officer, which was titled, "Written Negotiations for the Avoidance of Destruction of Property via Detonation of Explosives." During this encounter, an MPD officer observed multiple suspected destructive devices in the defendant's hands and inside the tent.




***Figure 1: the defendant holding destructive devices in his tent***

After observing the devices, law enforcement established a barricade around the defendant's tent to control the environment and bomb squad personnel were forced to respond to the scene.

The defendant's written demands included, among other things, requests for hundreds of thousands of dollars in payments to himself and others; that *federal arrest warrants be issued for all elected government officials and all judges so they could be held as terrorists* under the "Patriot Act designation*"* (emphasis added)*;* that the President of the United States call on Congress to declare war on the "rogue cartel state" formerly known as Arizona; extended hotel stays at the Mayflower Hotel in Washington, D.C.; the Supreme Court remove the state of Arizona from the United States, declare it a "foreign enemy," and limit the movements of the residents of Arizona; numerous requests to leaders of the Catholic and Jewish faiths, including but not limited to: (i) *barring woman from positions that carry legal authority over church holdings and parishes*; (ii) *excommunicating all Arizona-based Catholics*; and (iii) r*evealing the lie of the Holocaust* and removing all social controls based on it, especially in the "Jewish welfare system" in Germany (emphasis added); and finally, an expatriation flight to Japan.

While law enforcement tended to the situation, a business manager for St. Matthew's Cathedral responded outside and provided officers with a barring notice, which revealed that the defendant had been previously barred from returning to the church due to an incident that occurred on September 26, 2025.[3]

[3] On September 26, 2025, MPD officers responded to a call for service at St. Matthew's Cathedral and encountered the defendant. During this incident, the defendant told the responding officers he was upset with the church for not delivering a letter to the bishop on his behalf. Law enforcement also spoke to the church's staff, who noted that the defendant: (i) blocked the entrance to the cathedral with his tent and refused to leave; and (ii) attempted to deliver a letter to the bishop that mentioned something about "demolition." Due to this event, the church and MPD barred the defendant from returning to St. Matthews in the future.

At 5:53 a.m., the defendant left the tent, apparently to urinate. At that time, MPD officers approached and apprehended the defendant on the corner of the church steps. The defendant had one explosive device in his pocket, along with a butane lighter. Police searched the defendant's tent and found, among other things, more than one hundred similar destructive devices.




***Figure 2: items—including destructive devices—found inside of the defendant's tent***



***Figure 3: one of the six homemade destructive devices examined by the FBI laboratory***

Following his arrest, the defendant waived his *Miranda* rights and agreed to a custodial interview. During his interview, the defendant admitted to being barred from St. Matthew's Cathedral. According to the defendant, he wanted to speak with the auxiliary bishop of St. Matthews and wrote a letter attempting to contact him. Specifically, the defendant wanted to work with the church to coordinate non-violent protest activities aimed in support of granting sanctuary to the homeless and protesting the federalization of D.C. The defendant chose St. Matthews because it was a prominent church in the area.

The defendant further noted that he left Little Rock, Arkansas, on his motorcycle approximately four months before the interview, traveled through Huntsville, Alabama, and stayed in Arlington, Virginia. The defendant used credit cards and Supplemental Security Income to stay in Arlington hotels, and once the money ran out, he began sleeping in his tent. The defendant admitted to setting up his tent at St. Matthew's Cathedral for the two weeks preceding the interview, and prior to that time, the defendant camped at a small park near Georgetown, Washington, D.C.

The defendant described his destructive devices as “grenades” and “rockets.” He stated that the devices consisted of a proprietary mixture including nitromethane, magnesium, charcoal, and thermite. The defendant further stated that he purchased the materials in Arkansas and then manufactured the destructive devices in Virginia for use at the Red Mass.

The defendant admitted that he intended to use the threat of force posed by his explosive devices to coerce negotiations of his demands. The defendant further admitted he was *willing to use the devices to harm people and property—including St. Matthew’s Cathedral, the White House, the Washington Monument, the Capitol, and the Supreme Court—as part of his negotiations* (emphasis added).[4]

A representative sampling of six explosive devices was submitted for testing at an FBI laboratory. Testing confirmed the devices were improvised explosive devices (“IEDs”) and that the proprietary mixture used in the devices contained nitromethane. The devices included fuel, an initiator, a main charge, and fuel enhancements, meeting the definition of "destructive devices." They were also in operable condition, and the defendant did not register the destructive devices in the National Firearms Registration and Transfer Record.

## II. RELEVANT PROCEDURAL HISTORY

On February 24, 2026, a two-count information was filed against the defendant, charging him with violations of: (i) Title 18, United States Code, Section 1951 (Hobbs Act Extortion by Wrongful Use of Force, Violence, or Fear) (Count 1); and (ii) Title 26, United States Code, Sections 5845, 5861(d), and 5871 (Possession of an Unregistered Firearm (Destructive Device)) (Count 2). (ECF No 1). On March 5, 2026, the defendant pled guilty to the two-count information

[4] It should be noted that the defendant also stated he planned to target the Washington Monument first, which would allow the other buildings to evacuate and prevent people from being injured.

pursuant to a written plea agreement. (ECF No. 5).

In the plea agreement, the parties agreed that the defendant's: (i) criminal history score is 1; (ii) criminal history category is I; (iii) total offense level is 27; and (iv) estimated Guidelines' imprisonment range is 70-87 months. *Id.* A breakdown of how the parties arrived at these calculations is included below:

| Count | Offense | Guideline Description | U.S.S.G. Citation |
|---|---|---|---|
| 1 | Hobbs Act – Extortion | Base Offense Level<br>Implied Threat of Death<br>Demand Exceeded $20,000<br>Firearm was Possessed<br>Preparation to Carry Out Threat of Death<br>Acceptance of Responsibility | +18 §2B3.2<br>+2 §2B3.2(b)(1)<br>+2 §2B3.2(b)(2)<br>+5 §2B3.2(b)(3)(A)(iii)<br>+3 §2B3.2(b)(3)(B)<br>-3 §3E1.1(a) and (b)<br>**Total 27 [at least]** |
| | | | |
| 2 | Possession of Unregistered Firearm | Base Offense Level<br>Involved Three or More Firearms<br>Involved a Destructive Device<br>In Connection with Another Felony<br>Acceptance of Responsibility | +18 §2K2.1(a)(5)<br>+2 §2K2.1(b)(1)<br>+2 §2K2.1(b)(3)(B)<br>+4 §2K2.1(b)(7)(B)<br>-3 §3E1.1(a) and (B)<br>**Total 23 [at least]** |

The parties also agreed that pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), a sentence within the Guidelines' imprisonment range followed by three years of supervised release is appropriate in this case. *Id.*

On July 8, 2026, the draft Presentence Investigation Report ("PSIR") was filed with the Court. (ECF No. 10). In the draft PSIR, the probation officer concluded that the defendant's: (i) total offense level is 31; (ii) criminal history category is II; and (iii) guideline imprisonment range is 121 to 151 months.[5] *Id.* at 18. Notably, the probation officer found that an 8-level

[5] The probation officer also concluded that the Court may impose a term of supervised release of

enhancement should be applied to the defendant's base offense level because the offense involved between 100 and 199 firearms.[6] *Id*. at 6; *see also* U.S.S.G. § 2K2.1(b)(1)(D).

Defense counsel objected to paragraphs 21 and 22 of the draft PSIR, which pertain to the defendant's base offense level and the 8-level enhancement referenced above. Specifically, opposing counsel argued that the defendant's base offense level should be 18 and that he should only receive a 2-level enhancement for possessing 3-7 explosives pursuant to U.S.S.G. § 2K2.1(b)(1)(A). Thus, opposing counsel contended the parties agreed upon guideline range of 70-87 months was correct. The government did not file any objections to the draft PSIR because the plea agreement contemplated the six devices that were tested and confirmed to be functioning explosives.

On September 1, 2026, the final PSIR was filed with the Court. (ECF No. 14). In the final PSIR, the probation officer overruled the defendant's objections and adopted the draft PSIR in full. *Id*. at 24-25.

## III. LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."

---

not more than three years for both counts in the information. *Id*. at 19.

[6] Destructive devices fall under the definition of "firearm." *See* 18 U.S.C. § 921(a)(3).

*Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
> (i) issued by the Sentencing Commission . . .; and
> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
> (A) issued by the Sentencing Commission . . . and
> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies

broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022); s*ee also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## IV. <u>ARGUMENT</u>

The United States asks the Court to sentence the defendant to 87 months of imprisonment, which is the high-end of the Guidelines calculated in the plea agreement, and 3 years of supervised release. This sentence: (i) is consistent with the parties' plea agreement; (ii) reflects the serious nature of the offense; (iii) addresses the defendant's history and characteristics; (iv) promotes respect for the law; (v) provides just punishment for the offense; (vi) affords adequate deterrence to criminal conduct; and (vii) protects the public from further crimes of the defendant.

### A. The Nature and Circumstances of the Offenses

The nature and circumstances of the defendant's offenses support a sentence at the top of the Guidelines as set forth in the plea agreement. The defendant's crimes were not impulsive; they were calculated, intentional, and executed with the specific purpose of inflicting maximum harm. By targeting the Red Mass, the defendant deliberately sought to exploit a highly populated and

symbolically important Catholic event, attended by prominent legal and political officials, to achieve his own political goals.

The defendant's criminal conduct was the product of sustained and deliberate premeditation long before he entered Washington, D.C. on October 5, 2025. The defendant purchased the explosive materials in Arkansas and then manufactured the explosive devices in Virginia. Given the number of destructive devices along with the sophisticated proprietary mixture that he used to create the items—nitromethane, magnesium, charcoal, and thermite—the defendant demonstrated significant planning, efforts, and intentionality. At every stage of this escalating scheme, the defendant had clear and repeated opportunities to disengage. But he did not; instead, he made a series of conscious, deliberate decisions to continue forward, each step deepening the danger to innocent lives and historic property. Rather than abandoning his plan, the defendant intentionally refined, assembled and transported explosive weapons to St. Matthew's Cathedral to lend force and credibility to his threatening demands.

Upon arriving at the church, the defendant continued to carry out his plan with deliberate purpose. He unloaded a tent, multiple bags, and other personal belongings—including his homemade destructive devices—and placed them on the steps leading to the church's main entrance. This placement was intentional. The defendant positioned the explosives at the precise location where people would have to pass to enter St. Matthew's for the Catholic Red Mass, thereby maximizing both the immediacy and potential impact of the threat he intended to impose.

When MPD officers instructed the defendant to move his tent, he refused and instead demanded that federal agents be summoned to negotiate a handwritten list of ultimatums. He then escalated the situation further, threatening to throw one of his explosive devices into the street to demonstrate its destructive power. The defendant claimed to possess more than one hundred

explosive devices and warned officers that "*several of your people are going to die from one of these*" if he could not secure negotiations over his nine-page list of demands (emphasis added). Officers observed multiple explosive devices in his hands and inside the tent.

This encounter made unmistakably clear the extraordinary danger the defendant posed. He held volatile, homemade explosives—devices capable of detonating without warning—while threatening lethal violence to obtain his own political goals and personal benefits. His willingness to endanger officers and bystanders reveals a readiness to weaponize fear for self-interested gain. The police officers attempting to remove him faced immediate and severe risk, and any passersby walking near the cathedral could have been injured. The defendant was prepared to inflict extreme harm to secure money, lodging, a plane ticket, and other idiosyncratic demands, demonstrating that he was willing go to extraordinary lengths to serve his own interests.

After approximately 45 minutes, officers were finally able to arrest the defendant when he stepped away from the tent to urinate. Even then, he carried an explosive device in his pocket along with a butane lighter, placing the responding officers in grave danger.

In his post-arrest interview, after waiving his *Miranda* rights, the defendant openly admitted that he intended to use the threat of force posed by his explosives to coerce negotiations. He further stated that *he was willing to use those devices against people and property—including St. Matthew's Cathedral, the White House, the Washington Monument, the Capitol, and the Supreme Court—to advance his demands* (emphasis added). These admissions are deeply alarming. They show an individual with no moral constraints and someone who views innocent lives and iconic national landmarks as expendable leverage. Combined with his heightened sense of grandiosity, this profile underscores the need for a significant period of incarceration.

Six of the destructive devices were sent to the FBI laboratory for analysis. The testing

confirmed that the devices contained fuel, an initiator, a main charge, and fuel enhancements. Most importantly, they were in operable condition, corroborating the seriousness and credibility of the defendant's threats.

Section 3553(a) requires a sentence sufficient to protect the public, promote respect for the law, and provide adequate deterrence. Only a substantial term of imprisonment can accomplish those objectives in this case. The defendant has shown, through both his conduct and his willingness to employ extreme violence to achieve his aims, that he poses an ongoing and grave danger to the community. His attempt to send a message or champion a cause through political violence at a historic place of worship must be met with a significant sentence.[7]

Moreover, a below-guidelines sentence would not come close to capturing the extraordinary seriousness of his offenses. Such a sentence would minimize the harm he inflicted, diminish the weight of the law's condemnation, and fall short of the deterrent effect required in a case of this magnitude. The nature and circumstances of the defendant's conduct warrant a sentence that reflects the full measure of its severity and the need to safeguard the community from further politically motivated violence.

[7] Political violence is on the rise in the United States, particularly in Washington D.C. *See, e.g.*, USCP Officers Stop & Arrest Man with Loaded Shotgun Outside the U.S. Capitol, United States Capitol Police (Feb. 17, 2026), https://www.uscp.gov/media-center/press-releases/uscp-officers-stop-arrest-man-loaded-shotgun-outside-us-capitol; Man Charged for Planting Explosive Devices outside the RNC and DNC on January 5, 2021, United States Attorney's Office District of Columbia (Dec. 4, 2025), https://www.justice.gov/usao-dc/pr/man-charged-planting-explosive-devices-outside-rnc-and-dnc-january-5-2021; USCP Arrests Man Who Attempted to Light Car on Fire, United States Capitol Police (Jan. 8, 2025), https://www.uscp.gov/media-center/press-releases/uscp-arrests-man-who-attempted-light-car-fire; USCP Arrests Man with Flare Gun, Torch Lighter, & Bottles of Fuel, United States Capitol Police (Nov. 6, 2024), https://www.uscp.gov/media-center/press-releases/uscp-arrests-man-flare-gun-torch-lighter-bottles-fuel; Update: Checkpoint Attack, Apr. 6, 2021, United States Capitol Police (Apr. 6, 2021), https://www.uscp.gov/media-center/press-releases/checkpoint-attack-update.

**B. The Defendant's History and Characteristics**

The defendant's history and characteristics also support the requested relief. Despite having a privileged upbringing and educational and employment opportunities, the defendant has a history of violent assaults and has previously threatened a member of the legal community. Unfortunately, the defendant's criminality has now escalated to using explosives to target prominent individuals (including lawyers) and historic institutions and landmarks to achieve his political goals.

As noted in the final PSIR, the defendant grew up in Vineland, New Jersey, which he described as a "safe community," and he was raised by both of his parents. (ECF No. 14 at 13). The defendant described his childhood as "very good," denied any abuse or neglect, stated his material needs were met, and noted his family was financially secure. *Id*.

The defendant is also well educated. In 2009, the defendant received a bachelor's degree in biochemistry from Rowan University, and from 2009 to 2011, he attended Canadian College of Naturopathic Medicine in Toronto, Canada. *Id*. at 16. Rather than use his education in biochemistry and medicine for good, the defendant used his skills to make IEDs and bring them to a church.

The defendant also had employment opportunities. For instance, the defendant worked as a lab assistant and tutor while he was a student at Rowan University and he reported working as an assistant manager for six months at a farm in Princeton, New Jersey in 2015. *Id*.

All these life experiences provided the defendant with the foundation and tools to be a highly productive member of our society. But, as demonstrated in the criminal history section of the final PSIR, this has not been the case.

Specifically, the defendant has been convicted of the following offenses:

- Assault (Chandler, Arizona). On April 5, 2021, the defendant pled guilty and an

unknown fine amount was imposed;

- Indecent Exposure (Maricopa County, Arizona). On October 26, 2021, the defendant was sentenced to 36 months' probation. On August 9, 2022, the defendant's probation was revoked, and he was sentenced to twelve months of imprisonment.

*Id.* at 7-9. The defendant has also been arrested for, among other things, burglary, theft, possession of marijuana, use/possession with intent to use drug paraphernalia, multiple simple assaults, and threats to intimidate with injury or damage to property. *Id.* at 9-12. Notably, the defendant's actions at the Red Mass are not the first time he has targeted members of the legal profession. Indeed, according to a probation violation report, on May 13, 2022, the defendant was arrested after he filed a court motion *outlining a threat to kill a county attorney at his home*. *Id*. at 12 (emphasis added).

With respect to the simple assault arrests, according to court records, on April 20, 2003, while committing a theft, *the defendant inflicted bodily injury upon J.H. by striking the victim in the face with his face and took his wallet. Id.* at 10 (emphasis added). Court records also indicate that on February 24, 2007, *the defendant wrestled L.G. to the ground and hyperextended his neck* causing pain to his neck and back. *Id.* at 11 (emphasis added). These occurrences show that the defendant has used violence in the past, lending credence to the threats of violence he made in this matter.

Now, the defendant stands before the Court after transporting, manufacturing, and threatening to detonate numerous destructive devices at an important Catholic event in our nation's capital designed to celebrate the legal profession. Instead of using his intellect for good, he intentionally and deliberately designed explosive devices so he could threaten multiple different targets and advance his own political demands. And his prior criminal acts show that the defendant

was capable and willing to inflict injury and violence on others. Indeed, the defendant stated to law enforcement that people would die if he did not get what he wanted.

The defendant's mental health struggles do not diminish his criminal culpability here. While the government recognizes the defendant's diagnoses, the final PSIR notes that he failed to take certain medications and complete behavioral classwork as required. *Id*. at 15. Thus, the defendant could have taken greater steps to address his mental health conditions, and he cannot now claim that such concerns warrant a more lenient sentence.

Overall, the defendant's history and characteristics reinforce the need for a significant sentence. While his background helps explain some of the challenges he has faced, it does not diminish the extreme danger he poses to the community. On the contrary, his record demonstrates that he has committed violence in the past and that his violent behavior has only escalated in severity and scale. A lengthy custodial sentence will provide the defendant with the opportunity to participate in sustained mental health programming, but it will also protect the public from his dangerous conduct. For these reasons, the defendant's history and characteristics support the government's request for a high-end sentence.

**C. The Need for the Sentence Imposed**

The requested sentence is sufficient but not greater than necessary to meet the goals of sentencing. A sentence of 87 months' imprisonment and 3 years of supervised release is the only sentence that adequately reflects the gravity of the defendant's conduct and the harm he caused. It reinforces respect for the law by creating adequate deterrence to criminal conduct and political violence.

This sentence is also essential to provide both specific and general deterrence. The defendant's history and conduct in this case underscores the need for a punishment that will

dissuade him from future criminal activity (from which he has not been deterred in the past), while also sending a clear signal to others that they cannot come to Washington D.C. to engage in premediated political violence. Equally important, the recommended sentence serves to protect the public. The defendant's history and actions show that he presents a real risk of reoffending, and a lesser sentence would fail to mitigate that danger.

## V. CONCLUSION

For all the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 87 months' imprisonment and 3 years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: /s/ *Joshua Satter*
JOSHUA SATTER
Assistant United States Attorney
N.Y. Bar No. 5477112
601 D Street NW
Washington, D.C.
(202) 252-7566
Josh.Satter@usdoj.gov