**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

**v.**

**LOUIS GERI,**

**Defendant.**

**Crim. Action No.: 1:26CR32**

## MEMORANDUM IN AID OF SENTENCING

Louis Geri, through counsel, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), respectfully moves the Court to approve the negotiated plea agreement between the parties and impose a sentence at the low-end of the agreed-upon guideline range of 70 to 87 months for his offenses, Hobbs Act Extortion and Possession of a Destructive Device. Such a sentence fairly captures the sentencing factors and will account for the fact that untreated mental health issues were the root cause of Mr. Geri's conduct.

### I. Legal Standard

As this Court is well aware, in determining a sentence, courts must impose the least amount of imprisonment necessary to accomplish the purposes set forth in § 3553. 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary . . ." (emphasis added)). The Sentencing Guidelines ("Guidelines") range is advisory, to be considered alongside the other factors that § 3553(a) enumerates. *See United States v. Booker*, 543 U.S. 220 (2005). In Mr. Geri's case, the parties negotiated an agreement that reflects a consideration of Mr. Geri's offense conduct and his obvious mental health struggles. The parties agree that a sentence between 70 and 87

months meets the goals of sentencing in this case. Probation has also recommended a sentence within that range.

**i. Louis Geri's history and characteristics and the nature and circumstances of the offense counsel in favor of a sentence of 70 months**.

Louis Geri was born in 1984 in New Jersey, the younger of two children raised by his parents, Pamela and Louis Geri Sr., in an intact and, by most outward measures, ordinary home. His early years gave little hint of what was to come. He was a good student and a natural athlete. He played football, baseball, and wrestling. As the attached letters from family members attest, he was a kind and gentle child, loved by his family. To this point, his cousin, Laura Garvin writes, "[g]rowing up, Louis was a wonderful cousin to me. He was always kind, patient, helpful, and willing to spend to time with me." Letter of Laura Garvin. By all accounts, Mr. Geri had the kind of childhood that looks stable and unremarkable from the outside and, for a while, it was.

That changed as Mr. Geri entered his teenage years when the first signs of a serious mental illness began to surface. In what was likely an attempt to dull or manage those symptoms, he turned to alcohol and marijuana while still a teenager, self-medicating a condition he did not have a name for. His father has since passed away, and his mother does not wish to discuss this chapter of the family's life. However, Mr. Geri's uncle writes, "despite having a good family and a stable upbringing, Louis has struggled with mental and emotional difficulties that have made it difficult for him to function and fit into society the way most people are able to." Letter of Edward Garvin.

Records obtained by the defense document a pattern of crisis: several emergency hospitalizations at a local hospital following episodes of erratic and disturbing behavior. After one of these hospitalizations, in 2003, that Mr. Geri was diagnosed with bipolar disorder.

According to the National Institute of Mental Health, bipolar disorder is a condition marked by pronounced swings in mood, energy, and the ability to concentrate — cycling between manic episodes, marked by heightened, elated, or irritable energy, and depressive episodes, marked by sadness, hopelessness, or emotional flatness.[1] Consistent with Mr. Geri's presentation, NIMH also notes that bipolar disorder frequently co-occurs with other mental health conditions, and that some individuals experience psychotic symptoms such as hallucinations or delusions. *Id*.

Following the diagnosis, Mr. Geri was able to treat his symptoms with medication. He attended college, though still grappling with his mental illness, he had to leave his first college. He ultimately graduated from Rowan University in 2009.

After college, Mr. Geri worked odd jobs and stayed close to family. As his brother recounts in his letter to the Court, Mr. Geri became interested in growing organic vegetables. The family at owned two plots of land at the time, one small plot where Mr. Geri's grandparents lived and another plot a few miles away. Mr. Geri came up with a business plan to farm organic vegetables and together with his brother, put his plan to work. He and his brother managed the family farm for years. During this time, Mr. Geri also worked at another farm as a manager for a brief period. Mr. Geri's brother, Sam Geri, described Mr. Geri's work on the farm in his letter to the Court:

> Louis and myself worked for nearly a decade on a community focused organic vegetable farm, that my brother and I started near the end of 2011. During this time, until 2018 he we was medicated and capable of handling day to day responsibilities. This farm was a passion project of his where he often donated high quality produce to the elderly community center and a handful of local churches that ran soup kitchens. He also sold to local restaurants where they praised his quality produce and treated him with the same kindness he showed them. He was the most emotionally stable at this time in his life. He was capable of holding relationships and handling stress. Things changed when our father fell ill, my brothers mental state declined drastically at this time, my brother did not take this very well

[1] National Institute of Mental Health, *Bipolar Disorder*, https://www.nimh.nih.gov/health/topics/bipolar-disorder#hts-intro

> emotionally which lead to what I could only describe as a downward spiral of depression he could not escape.
>
> Letter of Sam Geri.

As described by his brother, after a long period of stability, medication management, and productive work, Mr. Geri experienced a severe setback when, in April 2025, his father passed away. He had been close to his father; his father had been the one in the family who was best equipped to help Mr. Geri manage his illness. The consequences compounded quickly. Because his father had been his representative payee, Mr. Geri's SSI benefits were interrupted following his death, leaving Mr. Geri without the means to manage even basic needs at a time when he was least equipped to cope. Without income, structure, or his father's guidance, Mr. Geri stopped taking his medication. His psychiatric symptoms escalated in the months that followed, and it was in this state—grieving, unmedicated, and destabilized—that the instant offense occurred.

**ii. Mr. Geri's involvement in the criminal legal system and the instant offense are the direct result of his mental illness.**

The nature and circumstances of the offense are troubling, but they are not the actions of someone seriously intent on hurting anyone. At the time of the offense, Mr. Geri was off his prescribed medication and in a state of acute psychosis. His conduct was the product of a treatable medical condition spiraling out of control, not malice or an actual intent to harm.

Mr. Geri has never engaged in violent behavior in the past. To the contrary, those who know him best — his family — describe a gentle, kind young man whose life has been shaped by a serious mental illness he did not choose and has struggled to manage. A sentence structured around supervised treatment, rather than a lengthy prison sentence, is both more likely to prevent re-offense and more consistent with the goals of sentencing: protecting the public by addressing the root cause of the conduct and imposing a just punishment that is proportionate to Mr. Geri's

culpability.

**iii. The sentencing guidelines**

The Court should accept the plea agreement negotiated by the parties and the guideline range agreed upon in the plea, 70 to 87 months. As for the PSR's calculations, Mr. Geri maintains that consistent with the parties' calculation in the plea agreement, Mr. Geri should receive a 2-level enhancement—not an 8-level enhancement—under USSG § 2K2.1(b)(1). Specifically, USSG § 2K2.1(b)(1)(A) provides for a 2-level increase where the offense involved between 3 and 7 firearms, including destructive devices. In this case, the FBI tested six devices and determined that those six qualified as destructive devices. However, there is no evidence that the remaining approximately 100 objects recovered from Mr. Geri's tent were tested or otherwise determined to meet the statutory or guidelines definition of "destructive devices." Accordingly, it is improper to treat all of the recovered objects as destructive devices for purposes of applying the enhancement. As the parties stipulated in the plea agreement, the appropriate enhancement is 2 levels because the offense involved between 3 and 7 destructive devices.

In any event, the parties agree that the Court should apply the guidelines (70 to 87 months) agreed to by the parties in the Rule 11(c)(1)(C) agreement.

**iv. The goals of sentencing will be met with a 70-month sentence followed by mental health services and supervision.**

Mr. Geri's offense was driven by untreated mental illness. Therefore, a lengthy prison sentence is not going to deter him. Instead, services that treat and manage his illness are needed to achieve specific deterrence. As for general deterrence, Mr. Geri will serve a lengthy sentence pursuant to the negotiated agreement, in any event. One or two additional years behind bars is not going to add to that deterrence value. And the research bears this out: certainty of prosecution, not severity

of punishment, drives deterrence.[2] As for just punishment, Mr. Geri's crime was not driven by greed or an intent to hurt anyone. He is a sick man who needs treatment. Warehousing him in prison for longer than necessary to obtain treatment will serve no retributive purpose.

Public safety is the only purpose of sentencing arguably served by a high-end guidelines sentence. But incarcerating Mr. Geri without addressing the root cause of his offense only postpones the risk. It does not eliminate it. The public is better served and protected by managing his mental illness in the community. Importantly, Mr. Geri has demonstrated that with the support of his family and with the benefit of structure, he can live a healthy, productive life. His family are ready and able to assist Mr. Geri's transition to the community after his sentence. His cousin, Laura, writes

> Louis comes from a large and loving family, and he has many people who are willing and able to support him upon his release. His family will be there to help him, encourage him, and hold him accountable as he moves forward. He has a strong support system waiting for him and people who genuinely care about his well-being, and reentry.

Providing Mr. Geri with appropriate services and allowing him to lean on the support of his family for care and comfort will, in the long run, better serve the community than continuing to warehouse him in prison—an approach that yields diminishing returns with each additional year of confinement. Every year Mr. Geri is locked up past a point that serves the sentencing goals is a year that erodes the factors such as family bonds, community ties, and employability, that make successful reentry for a person with mental illness possible.

**Conclusion**

For the reasons herein and the record in this case, the defense respectfully requests that the

---

[2] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

Court adopt the agreement between the parties and sentence Mr. Geri to the low-end of the agreed upon guideline range of 70 to 87 months.

A.J. KRAMER
FEDERAL PUBLIC DEFENDER
______/s______________
ELIZABETH MULLIN
Assistant Federal Public
Defender 625 Indiana Avenue,
N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500